**BURSOR & FISHER, P.A.**
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: jwilner@bursor.com

*Attorney for Plaintiff*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

SEBASTIAN GOLD, individually and on behalf of all others similarly situated,

Plaintiff,

v.

BETTERMENT LLC,

Defendant.

Case No.: '26CV6402 H BJW

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Sebastian Gold ("Plaintiff"), individually and on behalf of all other persons similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to themself and their counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1. This is a class action lawsuit brought on behalf of all persons who have accessed and used www.betterment.com (the "Website") for a variety of financial services, including investments and savings account services.

2. Defendant Betterment LLC ("Betterment") offers automated financial advising services through its Website. In order to create an account and utilize Defendant's service through the Website, users must share personally identifiable information ("PII") including their first name, last name, and e-mail address. This information is then linked to a user's account.

3. Despite reasonable expectations of privacy, and Defendant's legal duties to prevent the disclosure of private information, Defendant disclosed information provided by users of the Website, including email addresses, type of accounts held, account balances, transfer amounts, interest earned, and more to unannounced third parties, including but not limited to Snap, Inc. ("Snapchat") and ByteDance, Inc. ("TikTok") (together as the "Third Parties") through the use of tracking technologies like the Snap Pixel and TikTok Pixel (the "Tracking Technologies"). These disclosures include communications that contain sensitive and confidential information – i.e., "nonpublic personal information," as defined by 16 C.F.R. § 313.3 (the "Gramm-Leach-Bliley Act" or "GLBA") and Cal. Fin. Code § 4050, *et seq*. (the "California Financial Information Privacy Act" or "CalFIPA").

4. Defendant aids, employs, agrees, and conspires with Snapchat, TikTok, and a host of other third parties to intercept Plaintiff's and Class Members' sensitive and confidential communications in real time without their consent.

5. Through the acts alleged herein, Defendant violated the Electronic Communications Privacy Act, 18 U.S.C. 2511, *et seq*. ("ECPA") and the California Invasion of Privacy Act ("CIPA") §§ 631 and 632 by disclosing Plaintiff's and Class Members' private and confidential information without consent.

## THE PARTIES

6. Plaintiff Sebastian Gold is a natural person and citizen of California, residing in San Diego, California. Plaintiff has maintained an account with Betterment since at least 2023 and regularly accesses the Website to deposit and transfer funds and manage his investments, including throughout 2026.

7. Unbeknownst to Plaintiff, Defendant disclosed his email address, account types, account balances, transaction amounts, and page selections to the Third Parties—communications that contained Plaintiff's confidential, "nonpublic personal information" as defined by the GLBA, CalFIPA, and IIPPA. Neither Defendant, nor the Third Parties, procured Plaintiff's prior consent to the sharing of his private and protected information.

8. Defendant Betterment LLC is a SEC Registered Investment Advisor registered in Delaware with its principal place of business in New York, New York. Defendant develops, owns, and operates the Website, which is available throughout the United States.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the Electronic Communications Privacy Act, 18 U.S.C. § 2511). This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367. Further, this action is a putative class action, and Plaintiff alleges that at least 100 people comprise the proposed class, that the combined claims of the proposed class members exceed $5,000,000 exclusive of interest and costs, and that at least one member of the proposed class is a citizen of a state different from the defendant.

10. This Court has personal jurisdiction over the parties because Plaintiff resides in California, is a California citizen, and submits to the jurisdiction of the Court. Further, the Defendant has, at all times relevant hereto, systematically and continually conducted business in California, including within this District, and intentionally availed itself of the benefits and privileges of the California consumer market through the promotion, marketing, and operation of its services to residents within this District and throughout California. Additionally, Plaintiff used the Website while in California.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the Defendant transacts significant business within this District, the acts that gave rise to this cause of action occurred within this District, and Plaintiff resides in this District.

## FACTUAL ALLEGATIONS

### I. THE CALIFORNIA INVASION OF PRIVACY ACT

12. The California Legislature enacted the Invasion of Privacy Act to protect certain privacy rights of California citizens. The legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

13. The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call*." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

14. Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a

> conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas v. Clark*, 38 Cal. 3d 355, 360-61 (1985) (emphasis added, internal citations omitted).

15. As part of CIPA, the California Legislature enacted § 631(a), which prohibits any person or entity from [i] "intentionally tap[ping], or mak[ing] any unauthorized connection … with any telegraph or telephone wire," [ii] "willfully and without the consent of all parties to the communication … read[ing], or attempt[ing] to read, or to learn the contents or meaning of any . . . communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]," or [iii] "us[ing], or attempt[ing] to use . . . any information so obtained."

16. CIPA § 631(a) also penalizes those who "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

17. As part of the Invasion of Privacy Act, the California Legislature additionally introduced Penal Code § 632(a), which prohibits any person or entity from "intentionally and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication."

18. A "confidential communication" for the purposes of CIPA § 632 is "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto." Cal. Penal Code § 632(c).

19. Individuals may bring an action against the violator of CIPA §§ 631 and 632 for $5,000 per violation. Cal. Penal Code § 637.2(a)(1).

## II. THE GRAMM-LEACH-BLILEY ACT AND CALIFORNIA FINANCIAL INFORMATION PRIVACY ACT

20. As Congress and the California Legislature recognized, "nonpublic personal information" is confidential.

21. Per 16 C.F.R. § 313.3(n):

(1) Nonpublic personal information means:

(i) Personally identifiable financial information; and

(ii) Any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any personally identifiable financial information that is not publicly available.

22. Per 16 C.F.R. § 313.3(o):

(1) Personally identifiable financial information means any information:

(i) A consumer provides to [a financial institution] to obtain a financial product or service from [a financial institution];

(ii) About a consumer resulting from any transaction involving a financial product or service between [a financial institution] and a consumer; or

(iii) [A financial institution] otherwise obtain[s] about a consumer in connection with providing a financial product or service to that consumer.

(2) Examples—(i) Information included. Personally identifiable financial information includes:

(A) Information a consumer provides to [a financial institution]on an application to obtain a loan, credit card, or other financial product or service;

(B) Account balance information, payment history, overdraft history, and credit or debit card purchase information;

> (C) The fact that an individual is or has been one of [a financial institution's] customers or has obtained a financial product or service from [a financial institution];
>
> (D) Any information about [a financial institution's] consumer if it is disclosed in a manner that indicates that the individual is or has been [a financial institution's] consumer;
>
> (E) Any information that a consumer provides to [a financial institution] or that [a financial institution]or [its] agent otherwise obtain[s] in connection with collecting on, or servicing, a credit account; and
>
> (F) Any information [a financial institution] collect[s] through an Internet "cookie" (an information collecting device from a web server).

23. Pursuant to 16 C.F.R. § 313.3(k)(1): a financial institution "means any institution the business of which is engaging in an activity that is financial in nature or incidental to such financial activities as described in section 4(k) of the Bank Holding Company Act of 1956, 12 U.S.C. 1843(k). An institution that is significantly engaged in financial activities, or significantly engaged in activities incidental to such financial activities, is a financial institution."

24. Pursuant to 16 C.F.R. § 313.3(k)(1), Defendant is a financial institution.

25. In passing CalFIPA, the California Legislature "intend[ed] for financial institutions to provide their consumers notice and meaningful choice about how consumers' nonpublic personal information is shared or sold by their financial institutions[]" and "inten[ded] . . . to afford persons greater privacy protections than those provided in Public Law 106-102, the federal Gramm-Leach-Bliley Act[.]" Cal. Fin. Code § 4051(a)-(b).

26. Cal. Fin. Code § 4052(a) provides that:

> "Nonpublic personal information" means personally identifiable financial information (1) provided by a consumer to a financial institution, (2) resulting from any transaction with the consumer or any service performed for

the consumer, or (3) otherwise obtained by the financial institution.

27. According to Cal. Fin. Code § 4052(b):

"Personally identifiable financial information" means information (1) that a consumer provides to a financial institution to obtain a product or service from the financial institution, (2) about a consumer resulting from any transaction involving a product or service between the financial institution and a consumer, or (3) that the financial institution otherwise obtains about a consumer in connection with providing a product or service to that consumer. Any personally identifiable information is financial if it was obtained by a financial institution in connection with providing a financial product or service to a consumer. Personally identifiable financial information includes all of the following:

(1) Information a consumer providers to a financial institution on an application to obtain a loan, credit card, or other financial product or service.

(2) Account balance information, payment history, overdraft history, and credit or debit card purchase information.

(3) The fact that an individual is or has been a consumer of a financial institution or has obtained a financial product or service from a financial institution.

(4) Any information about a financial institution's consumer if it is disclosed in a manner that indicates that the individual is or has been the financial institution's consumer.

(5) Any information that a consumer provides to a financial institution or that a financial institution or its agent otherwise obtains in connection with collecting on a loan or servicing a loan.

> (6) Any personally identifiable financial information collected through an Internet cookie or an information collecting device from a Web server.

28. "Except as provided in Sections 4053, 4054.6, and 4056, a financial institution shall not sell, share, transfer, or otherwise disclose nonpublic personal information to or with any nonaffiliated third parties without the explicit prior consent of the consumer to whom the nonpublic personal information relates." Cal. Fin. Code § 4052.5.

29. Thus, Plaintiff's and Class Members' "nonpublic personal information" is confidential, under both federal and California law. Nonetheless, such information was intercepted in transit by Snapchat and TikTok as enabled by Defendant—and neither Defendant, Snapchat, nor TikTok procured Plaintiff's and Class Members' consent prior to this interception.

30. This pattern of conduct by Defendant flouts the GLBA's and CalFIPA's respective purposes of enhancing "financial privacy[.]"[1]

## III. DEFENDANT'S WEBSITE

31. Defendant's Website is a financial platform accessible across the country that offers a variety of investment and wealth tools.

32. Users trust Defendant with their investment and retirement accounts, including automated investing, self-investing, IRAs, crypto investing, and retirement planning.

33. At all relevant times, Defendant implemented the Tracking Technologies to intercept Plaintiff's and Class Members communications with the website, as outlined below.

34. Nowhere on the Website does Defendant request or receive users' affirmative consent. In fact, the Tracking Technologies are active as soon as the

---

[1] http://www.leginfo.ca.gov/pub/03-04/statute/ch_0201-0250/ch_241_st_2003_sb_1. *See also* https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=200320040SB1.

Website loads, before users could even conceivably be put on notice or provide affirmative consent to the tracking at issue here.

35. As discussed herein, the private nature of the information entered into the Website gives users the understanding that Defendant will keep their information confidential.

## IV. DEFENDANT DISCLOSES USERS' PRIVATE INFORMATION TO SNAPCHAT AND TIKTOK

### A. Snapchat's Tracking Technology

36. Snapchat is a social media and messaging application that "offers a range of APIs through its Snap Kit, Lens Studio, and Marketing API, allowing developers to integrate Snapchat's features into their own applications."[2] Snapchat's Marketing API "is used for creating, managing, and optimizing advertising campaigns on Snapchat, including for targeting, budding, and tracking ad performance."[3]

37. Specifically, the Snapchat Marketing tool "provides a programmable interface to interact with Snapchat's advertising tools. This API enables automated creation and management of ad campaigns, audience targeting, and performance analytics, which can be a boom for marketers seeking to streamline their Snapchat advertising workflows."[4]

38. Snapchat offers a software service called "Snap Pixel," which "helps advertisers measure results, optimize targeting, and build audiences for their ad campaigns."[5] The Snap Pixel is part of a line of prebuilt software tools under the "Business" product line that allow the delivery of personalized ads by collecting user

---

[2] Charu Mitra Dubey, *Snapchat API: Developer Guide on How to Integrate Snapchat API*, PHYLLO (July 10, 2024), https://www.getphyllo.com/post/snapchat-api-guide.

[3] *Id.*

[4] *Snapchat Marketing API Integrations*, PIPEDREAM, https://pipedream.com/apps/snapchat-marketing.

[5] *Power Performance with the Snap Pixel*, SNAPCHAT, https://forbusiness.snapchat.com/advertising/snap-pixel.

data through the Snap Pixel, which is used to deliver more effective targeted advertisements, increasing revenue for the websites that install the Pixel.

39. The Snap Pixel can be plugged into any website, as the pixel is "a piece of JavaScript code that's either installed on [a] website or integrated with an e-commerce store."[6]

40. When users interact with a webpage with the Snap Pixel installed, the Snap Pixel "tracks a variety of actions on [a] website, such as page views, add-to-cart actions, purchases, and sign-ups," as well as other "events," such as button clicks and other selections.[7] The information is sent automatically to Snapchat.

41. The Snap Pixel "may send . . . (hashed) email addresses, (hashed) phone numbers and/or device identifiers, IP addresses, cookie IDs, metadata, and browser/app information" to Snapchat.[8] The information sent via is also accompanied with the sc_at cookie. Snapchat indicates that the sc_at cookie is "[u]sed to identify a visitor across multiple domains."[9]

42. The Snapchat advertising business model involves entering into voluntary partnerships with various companies and surveilling communications on their partners' websites with the Snap Pixel.

43. One of Snapchat's partners is Betterment.

44. Thus, through websites that install the Snap Pixel, Snapchat directly receives the electronic communications of website visitors.

45. When the Snap Pixel is used on an entry to a website, it is not like a tape recorder, or a "tool" used by one party to record the other. Instead, the Snap Pixel involves Snapchat, a separate and distinct third-party entity from the parties in the

---

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Cookie Information*, SNAPCHAT, https://www.snap.com/privacy/cooke-information.

conversation. That data is then analyzed by Snapchat before being provided to any entity that was a party to the conversation, like Defendant.

46. The purpose of such transmissions is so companies, like Defendant, can better advertise and target consumers on Snap's social media platform by enabling Snap to learn who visits the companies' websites. This also benefits Snap, as it allows Snap to monetize its Snapchat social media platform through advertising revenue, and the better at targeting Snap is, the more companies, like Defendant, will pay to advertise on Snapchat.

47. Indeed, Snap provides various forms of targeted advertising based on the information it collects, including location and demographic targeting, e-mail based targeting, or targeting based on those similar to companies' "customer list or Pixel Custom Audience."[10] And, Snap will actually tell website operators like Defendant "how well your pixel setup matches events to Snapchat Accounts," enabling companies, like Defendant, to send further identifying information to Snap so it can better match website users to Snapchat accounts.[11]




**Figure 10**

48. Transmissions from users' browsers to Snapchat through the Snap Pixel occur in the same manner on each website where the technology is loaded. When an

[10] *Meet Your Audience*, SNAPCHAT BUSINESS, https://forbusiness.snapchat.com/advertising/targeting.

[11] *Snap Pixel: Power Your Ad Performance*, SNAPCHAT, https://forbusiness.snapchat.com/advertising/snap-pixel.

action is taken on a website, the individual's browser sends a request to Defendant's server requesting that server to load the particular webpage. Snapchat's embedded code, written in JavaScript, sends secret instructions back to the individual's browser, without alerting the individual that this is happening. Snapchat causes the browser to secretly and contemporaneously duplicate the communication with a website transmitting it to Snapchat's servers, alongside additional information that transcribes the communication's content and the individual's identity. This transmission is initiated by Snapchat's code, which is part of the Website's source code and therefore commands the website visitor's browser to take certain actions at the moment when a specified event (like a button click) triggers the code. The transmissions intercepted by Snapchat, therefore, are concurrent with the communications with the host website.

**B. TikTok's Tracking Technology**

49. TikTok offers a SaaS called "TikTok Pixel," which "helps businesses track the performance of their ads" by simultaneously sending information from the business's website to TikTok, which then uses that information to optimize ad campaigns on TikTok and across the internet.[12]

50. The TikTok Pixel can be "plugged in" to any website, as the pixel is a piece of code that can be added to any website to capture "events" (any activity by a user that happens on a website).

51. The TikTok Pixel is part of a package of prebuilt software tools under the "TikTok for Business" product line that allow the delivery of personalized ads. By employing TikTok to collect user information through the TikTok Pixel, websites that procure TikTok's services can use the information to deliver more effective targeted advertisements, increasing revenue for the websites.

52. In short, when users interact with a webpage with the TikTok Pixel installed, the TikTok Pixel collects the "Metadata and button clicks" (information

---

[12] "*TikTok Pixel 101: What It Is & How to Use It,*" https://popupsmart.com/blog/tiktok-pixel.

about what the user clicked on—such as the specific URL address visited by the user—or text entered into the webpage), a timestamp for the event, and the visitor's IP address.[13] That information is automatically and simultaneously sent to TikTok.

53. The "TikTok for Business" business model involves entering into voluntary partnerships with various companies and surveilling communications on their partners' websites with the TikTok Pixel.

54. Thus, through websites that employ TikTok's services, TikTok directly receives the electronic communications that website visitors enter into search bars, chat boxes, and button selections in real time.

55. When the TikTok Pixel is used on a website, it is not like a tape recorder or a "tool" used by one party to record the other. Instead, the TikTok Pixel involves TikTok, a separate and distinct third-party entity from the parties in the conversation, using the TikTok Pixel to eavesdrop on, record, extract information from, and analyze a conversation to which it is not a party. This is so because TikTok itself is collecting the content of any conversation. That information is then analyzed by TikTok before being provided to any entity that was a party to the conversation (like Defendant).

56. Once TikTok intercepts website communications, it has the capability to use such information for its own purposes. TikTok's Commercial Terms of Service grant TikTok "a nonexclusive, royalty-free, worldwide, transferable, sublicensable license to access, use, host, cache, store, display, publish, distribute, modify and adapt [information collected from partner websites] in order to develop, research, provide, promote, and improve TikTok's products and services."[14]

57. In practice, this means the information collected is used to: (i) analyze trends in consumer behavior based on data collected from websites across the internet that TikTok can then use when providing targeted advertising to other companies; (ii)

---

[13] "*About TikTok Pixel,*" https://ads.tiktok.com/help/article/tiktok-pixel?redirected=2.

[14] "*TikTok For Business Commercial Terms Of Service*" https://ads.tiktok.com/i18n/official/ policy/commercial-terms-of-service.

create consumer profiles of specific users, allowing TikTok to sell future customers targeted advertising to consumers with specific profile characteristics; and (iii) develop new TikTok Business products and services, or improve pre-existing TikTok Business products and services.

58. Transmissions from users' browsers to TikTok through the TikTok Insight Tag occur in the same manner on each website where the technology is loaded. When an action is taken on a website, the individual's browser sends a GET request to Defendant's server requesting that server to load the particular webpage. TikTok's embedded code, written in JavaScript, sends secret instructions back to the individual's browser, without alerting the individual that this is happening. TikTok causes the browser to secretly and contemporaneously duplicate the communication with a website transmitting it to TikTok's servers, alongside additional information that transcribes the communication's content and the individual's identity. This transmission is initiated by TikTok's code, which is part of the Website's source code and therefore commands the website visitor's browser to take certain actions at the moment when a specified event (like a button click) triggers the code. The transmissions intercepted by TikTok, therefore, are concurrent with the communications with the host website

### C. How Defendant Disclosed Plaintiff's and Class Members' Protected Personally Identifiable Information and Financial Information Through The Snap Pixel and TikTok Pixel

59. Defendant owns and operates the Website, where it encourages visitors to transfer and store their money in investment, savings, and retirement accounts.

60. At all relevant times, Defendant's Website utilized the Snap Pixel and TikTok Pixel.

61. Through the Snap Pixel and TikTok Pixel, Defendant disclosed their users' identities and online activity, including information related to consumers' financial condition and investments, with two of the world's largest technology companies for targeted advertising purposes.

62. When a user visits the website and logs in to their account, Snapchat and TikTok receive the user's email address associated with the account.




63. Although TikTok and Snapchat collect hashed SHA256[15] e-mail addresses, the reality is that "the match between your email and its hash is probably already circulating widely and companies are marking money from it."[16] Given the availability online of such "leaked" email/hashed email matches, entities are merely "pretend[ing]to protect your privacy"[17] through SHA-256 and/or other hashing algorithms.

[15] DEFINITION OF HASH, https://www.pcmag.com/encyclopedia/term/hash; *see also About Advanced Matching for Web*, TIKTOK (last updated Sep. 2025), https://ads.tiktok.com/help/article/advanced-matching-web?lang=en.

[16] PIXEL DE TRACKING, GUERLAIN (LVMH): LUXURY AND SURVEILLANCE, https://www-pixeldetracking-com.translate.goog/fr/votre-email-comme-vecteur-de-surveillance-ultime-illustration-avec-guerlain?_x_tr_sl=fr&_x_tr_tl=en&_x_tr_hl=en&_x_tr_pto=sc.

[17] *Id.*

64. The Federal Trade Commission has warned companies for over a decade—including as recently as July 24, 2024—that hashing is an insufficient method of anonymizing information.[18]

65. Thus, even in hashed form, email addresses are traceable to individuals.

66. TikTok and Snapchat also collect sensitive information about the user's accounts and the selections the user makes in of their password-protected account and investment portal in real time.

67. For example, when a user clicks the button to select an account, both Snapchat and TikTok receive "button click" events containing the account name and balance for the account.




"inner_text":"Marcus Invest <#SEXUAL_ORIENTATION#>fer - Generalinvesting\n1 Account\n$[redacted]"

"inner_text":"Retirement\n1 Account\n$[redacted]\nBuiltto help maximize your after-taxreturns, our Tax Coordinationfeaturecould help you h

---

[18] Ed Felten, *Does Hashing Make Data "Anonymous"?*, Federal Trade Commission (Apr. 22, 2012), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2012/04/does-hashing-make-data-anonymous ("[H]ashing is vastly overrated as an 'anonymization' technique … the casual assumption that hashing is sufficient to anonymize data *is risky at best, and usually wrong*.") (emphasis added); *No, Hashing Still Doesn't Making Your Data Anonymous*, Federal Trade Commission (July 24, 2024) ("[H]ashes aren't 'anonymous' and can still be used to identify users, and their misuse can lead to harm. Companies should not act or claim as if hashing personal information renders it anonymized.").

68. Similarly, when the user makes a selection for a deposit, that information is transmitted to Snapchat and TikTok in real time.




"inner_text":"Deposit"

69. The same is true when the user makes a selection to open a new account.




"inner_text":"IRA"

70. The information disclosed by Defendant allows Snapchat and TikTok to know the identities of specific individuals as well as their private financial

information. This allows these companies, including Defendant, to profit from this information for targeted advertising purposes.

71. When users log in to their Betterment accounts, they expect their account information, including the status of their personal finances, to be protected. Moreover, when consumers seek a specific service from financial websites, they also expect the highly sensitive information they provide on their websites to be kept confidential.

72. Through the above-listed Third Party tracking services, which Defendant used via the software code installed, integrated and embedded into the Website, Betterment disclosed its customers' legally protected information.

73. Defendant engages in this deceptive conduct for its own profit at the expense of its customers' privacy. Such disclosures are an invasion of privacy, lead to harassing targeted advertising, and violate federal and state law.

## CLASS ALLEGATIONS

74. Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Classes:

> **Nationwide Class:** All natural persons in the United States who, during the class period, maintained a Betterment account and accessed their account on the Website.

> **California Subclass:** All natural persons in the State of California who, during the class period, maintained a Betterment account and accessed their account on the Website.

75. Plaintiff reserves the right to modify the Class definitions, including by using subclasses, as appropriate based on further investigation and discovery obtained in the case.

76. The following people are excluded from the Classes: (1) any Judge presiding over this action and members of their family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest (including current and former employees,

officers, or directors); (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

77. **Numerosity:** The number of persons within the Classes is substantial and believed to amount to thousands of persons. It is, therefore, impractical to join each member of the Classes as a named plaintiff. Further, the size and relatively modest value of the claims of the individual members of the Classes render joinder impractical. Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation. Moreover, the Classes are ascertainable and identifiable from Defendant's, Snapchat's, and TikTok's records.

78. **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Classes and that predominate over any questions affecting only individual members of the Classes. These common legal and factual questions, which do not vary between members of the Classes, and which may be determined without reference to the individual circumstances of any Class member, include, but are not limited to, the following: whether Defendant violated the ECPA, the CIPA §§ 631 and 632, and whether Plaintiff and the proposed Class members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

79. **Typicality:** The claims of the named Plaintiff are typical of the claims of the Classes because the named Plaintiff, like all other class members, visited the Website and had his confidential electronic communications intercepted and disclosed to Snapchat and TikTok through the Tracking Technologies.

80. **Adequate Representation:** Plaintiff is an adequate representative of the Classes because his interests do not conflict with the interests of the Class members

he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of members of the Classes will be fairly and adequately protected by Plaintiff and his counsel.

81. **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Classes. Each individual member of the Classes may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSE OF ACTION

### COUNT I
### Violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2511, *et seq.*

82. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

83. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

84. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

85. The ECPA protects both sending and the receipt of communications.

86. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

87. The transmission of Plaintiff's PII and financial information to Defendant's Website qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

88. The transmission of PII and financial information between Plaintiff and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

89. The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. 18 U.S.C. § 2510(8).

90. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

91. The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5).

92. The following instruments constitute "devices" within the meaning of the ECPA:

a. The computer codes and programs Defendant and the Third Parties used to track Plaintiff and Class Members communications while they were navigating the Website;

b. Plaintiff's and Class Members' browsers;

c. Plaintiff's and Class Members' mobile devices;

d. Defendant's and the Third Parties' web and ad servers;

e. The plan the Defendant and the Third Parties carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website.

93. Plaintiff and Class Members' interactions with Defendant's Website are electronic communications under the ECPA.

94. By utilizing and embedding the tracking technology provided by the Third Parties on its website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class Members in violation of 18 U.S.C. § 2511(1)(a).

95. Specifically, Defendant intercepted—in real time—Plaintiff's and Class Members' electronic communications via the tracking technology provided by the Third Parties on the Website, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' PII and financial information to the Third Parties.

96. Defendant intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class Members regarding PII, including their email addresses, information related to the specific financial product they utilized, and their account balances. This confidential information is then monetized for targeted advertising purposes, among other things.

97. By intentionally disclosing or endeavoring to disclose Plaintiff's and Class Members' electronic communications to the Third Parties through the Tracking Technologies, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

98. By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class members' electronic communications, while knowing or having reason to

know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

99. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, the GLBA, CalFIPA, and invasion of privacy, among others.

100. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State. Here, as alleged above, Defendant violated a provision of the Gramm-Leach-Bliley Act, 16 C.F.R. § 313. This provision imposes a criminal penalty for knowingly disclosing "nonpublic personal information" to a third party. GLBA defines nonpublic personal information as:

> Any information that is not publicly available and that: a consumer provides a financial institution to obtain a financial product or service from the institution; results from a transaction between the consumer and the institution involving a financial product or service; or a financial institution otherwise obtains about a consumer in connection with providing a financial product or service.[19]

101. Plaintiff's information that Defendant disclosed to the Third Parties qualifies as nonpublic personal information (including their email address and account information and balances), and Defendant violated Plaintiff's and Class Members' expectations of privacy. Such conduct constitutes tortious and/or criminal conduct through a violation of 16 C.F.R. § 313. Defendant specifically used the tracking technology provided by the Third Parties to track and utilize Plaintiff's and Class Members' PII for financial gain.

---

[19] 16 C.F.R. § 313

102. Defendant was not acting under the color of law to intercept Plaintiff's and Class Members' wire or electronic communications.

103. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy. Plaintiff and Class Members, all of whom are users of the Website, had a reasonable expectation that Defendant would not redirect their communications to the Third Parties without their knowledge or consent.

104. The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq*.

105. As a result of each and every violation thereof, on behalf of himself and the Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2511, *et seq*. under 18 U.S.C. § 2520.

**COUNT II**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 631(a)**

106. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

107. Plaintiff brings this claim against Defendant individually and on behalf of the members of the California Subclass.

108. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section

109. CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

110. The Third Parties' Pixels are a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

111. The Third Parties are a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, the Third Parties have the capability to use and do use the wiretapped information for their own purposes. Accordingly, Snapchat and TikTok are third parties to any communication between Plaintiff and California Subclass

Members, on the one hand, and Defendant, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

112. At all relevant times, Snapchat and TikTok willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff and members of the California Subclass, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

113. At all relevant times, Snapchat and TikTok used or attempted to use the communications intercepted to, *inter alia*, monitor and improve their products and services.

114. At all relevant times, Defendant aided, agreed with, employed, permitted, or otherwise enabled the Third Parties to wiretap Plaintiff and members of the California Subclass through the Pixels and to accomplish the wrongful conduct at issue here.

115. Plaintiff and members of the California Subclass did not provide their prior consent to Snapchat's or TikTok's intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's and California Subclass members' electronic communications. Nor did Plaintiff and California Subclass members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct.

116. The wiretapping of Plaintiff and California Subclass members occurred in California, where Plaintiff and California Subclass members accessed the Website and where the Third Party Tracking Technologies—as enabled by Defendant—routed Plaintiff's and California Subclass members' electronic communications to their servers.

117. Pursuant to Cal. Penal Code § 637.2, Plaintiff and California Subclass members have been injured by Defendant's violations of CIPA § 631(a), and each

seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

**COUNT III**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 632**

118. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

119. Plaintiff brings this claim against Defendant individually and on behalf of the members of the California Subclass.

120. Cal. Penal Code § 632 prohibits "intentionally and without the consent of all parties to a confidential communication," the "use[] [of] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication."

121. Section 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

122. Plaintiff's and Class members' communications to Defendant, including their sensitive personal and financial information, were confidential communications for purposes of § 632, because Plaintiff and Class Members had an objectively reasonable expectation of privacy in this data.

123. Plaintiff and Class Members expected their communications to be confined to Defendant in part, due to the protected nature of the information at issue. Plaintiff and Class Members did not expect the Third Parties to secretly eavesdrop upon or record this confidential information and their communications.

124. The Third Party Tracking Technologies are all electronic amplifying or recording devices for purposes of § 632.

125. By contemporaneously intercepting and recording Plaintiff's and Class Members' confidential communications to Defendant through this technology, the Third Parties eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 632 of CIPA.

126. At no time did Plaintiff or Class Members consent to Snapchat's or TikTok's conduct, nor could they reasonably expect that their communications would be overheard or recorded by Snapchat and/or TikTok.

127. The Third Parties utilized Plaintiff's and Class Members' sensitive personal and financial information for their own purposes, including for targeted advertising.

128. Plaintiff and Class Members seek statutory damages in accordance with § 637.2(a) which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiff and the Classes in an amount to be proven at trial, as well as injunctive or other equitable relief.

129. Plaintiff and Class Members have also suffered irreparable injury from these unauthorized acts. Plaintiff's and Class Members' sensitive data has been collected, viewed, accessed, stored, by Snapchat and TikTok, have not been destroyed, and due to the continuing threat of such injury, have no adequate remedy at law. Plaintiff and Class Members are accordingly entitled to injunctive relief.

## COUNT IV
## Violation Of The California Constitution/Intrusion Upon Seclusion

130. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

131. Plaintiff brings this claim against Defendant individually and on behalf of the members of the California Subclass.

132. Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications and protected health information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and Class Members' knowledge or consent.

133. At all relevant times, by using the Tracking Technologies to record and communicate patients' email addresses and other identifying information alongside their confidential medical communications, Defendant intentionally invaded Plaintiff's and Class Members' privacy rights under the California Constitution.

134. Plaintiff and Class Members had a reasonable expectation that their communications, identities, health information, and other data would remain confidential, and that Defendant would not install wiretaps on the Website.

135. Plaintiff and Class Members did not authorize Defendant to record and transmit Plaintiff's and Class Members' private financial communications alongside their personally identifiable information.

136. This invasion of privacy was serious in nature, scope, and impact because it related to patients' private financial communications. Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

137. Accordingly, Plaintiff and Class Members seek all relief available for invasion of privacy claims under California's Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a) For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b) For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d) An award of statutory damages to the extent available;

(e) For punitive damages, as warranted, in an amount to be determined at trial;

(f) For prejudgment interest on all amounts awarded;

(g) For injunctive relief as pleaded or as the Court may deem proper; and

(h) For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

**JURY TRIAL DEMANDED**

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiff demands a trial by jury of all issues so triable.

Dated: November 10, 2026

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Joshua R. Wilner*
Joshua R. Wilner

Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: jwilner@bursor.com

*Attorney for Plaintiff*